## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

LINDA E. AYER,                                )
                                              )
                    Plaintiff,                )
                                              )
v.                                            )          Civil No. 04-213-B-W
                                              )
LIBERTY LIFE ASSURANCE                        )
COMPANY OF BOSTON,                            )
                                              )
                    Defendant.                )

## ORDER ON MOTION FOR JUDGMENT
## ON STIPULATED RECORD

Afflicted with myasthenia gravis, Plaintiff Linda E. Ayer challenges Defendant Liberty Life Assurance Company of Boston's (Liberty) denial of her claim for long-term disability benefits. Because Liberty's denial was supported by substantial evidence, this Court GRANTS Defendant's Motion for Judgment on Stipulated Record (Docket # 11).

## I. FACTUAL BACKGROUND

### A. The Plaintiff's Claim

This case arises out of Ms. Ayer's claim for long-term disability benefits under an insurance policy Liberty issued to her employer FleetBoston Financial Corporation (Fleet). Ms. Ayer filed suit under 29 U.S.C. § 1132(a)(1)(B),[1] the civil enforcement section of the Employee Retirement Income Security Act of 1974 (ERISA), alleging wrongful denial of long-term disability benefits payable under Liberty's policy. *See Compl.* (Docket #1).

### B. Submission on a Stipulated Record

The parties have submitted this case for judgment on a stipulated record. *See* Docket # 11, 15, 19. **"**[T]o stipulate a record for decision allows the judge to decide any significant issues

---

[1] Ms. Ayer also seeks attorney fees under 29 U.S.C. § 1132(g)(1).

of material fact that he discovers." *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 11-12 (1st Cir. 1985); *see also Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.,* 210 F.3d 18, 31 (1st Cir. 2000), *cert. denied*, 531 U.S. 1014 (2000).

### C.  Myasthenia Gravis

Ms. Ayer began working at Fleet in 1976 and was employed most recently as a branch operations supervisor.   D56-57.[2]   Her last day of work was October 28, 2002, after her neurologist, Stephanie Lash, M.D., advised her to stay out of work because of speech problems caused by myasthenia gravis (MG).   D56; D158.   MG is an acquired autoimmune disorder of neuromuscular transmission.   D747.   "The distinctive feature of MG is fluctuating weakness of muscles, made worse by use of those muscles and improved at least partially by rest of the same muscles."  D752.  MG affects people differently.  *Id*.  MG may affect the muscles which move the eyeball and hold the eyelids open, the muscles that control facial expressions, smiling, chewing, talking, or swallowing, and the muscles of the neck and limbs.  *Id*.  Weakness of the bulbar muscles (muscles which control chewing, swallowing, and articulation) can result in difficulty swallowing and slurred speech.  D748; D753; D760.  MG can cause fatigue in leg and arm muscles, and patients can experience difficulty with activities such as combing hair, lifting objects repeatedly, climbing stairs, walking, and running.  D748.  MG symptoms may fluctuate from hour to hour, day to day, or over longer periods of time.  D747.  Symptoms are provoked or worsened by exertion, exposure to temperature extremes, infections, menses, excitement, and emotional stress.  D748; D754.

### D.  September 1997 – October 8, 2002:  Symptoms  and Course of Treatment

---

[2] The parties have provided this Court with a copy of the full administrative record containing a "D" Bates prefix. This Court has referred to the record using these Bates numbers.

In September 1997, Ms. Ayer noticed her right eyelid was drooping.  D351.   By December 1997, she began to experience difficulty talking and eating, and on these occasions, her tongue felt "thick," as though it was stuck on the roof of her mouth.  D351-353.  She described her speech as "slurry" and "garbled"; she reported difficulty in forming sounds, "almost like [a] baby" and as if she had "marbles in [her] mouth"; and, she mentioned that solid foods felt like they got stuck upon swallowing.  *Id.*; D355.  She continued to report these symptoms to her primary care physician, Dr. Kenneth Simone, beginning December 1997, and on February 11, 1998, he referred her to Dr. Lash.  D351-357.

When Ms. Ayer first saw Dr. Lash on April 3, 1998, she was no longer having any symptoms.  D611.  However, when she described her prior symptoms of eyelid drooping, thick tongue, and progressive difficulty speaking or swallowing, Dr. Lash recognized these symptoms as suggestive of "mild myasthenic process" and ordered a blood test to look for an elevated acetylcholine receptor antibody level.[3]  D611-612.  The acetylcholine receptor antibody test results confirmed Ms. Ayer's level was elevated at 3.1.  D490.  At her next visit, on April 23, 1998, Ms. Ayer reported no new symptoms, and Dr. Lash diagnosed her with "mild [MG] which at the present does not require medication intervention."  D610.

On July 8, 1998, Dr. Lash observed that, although Ms. Ayer complained of twitching around the eyes, bridge of nose, and arms over the past year, "no perceptible abnormal muscle contractions were appreciated around the eyes, nose or in the upper extremities" and specifically, "no fasciculations[4] were appreciated."  D609.  Dr. Lash commented that muscle twitching is an

---

[3] The acetylcholine receptor antibody test is a blood test that is very specific for detecting MG.  Eighty percent of all persons with MG have abnormally elevated levels of these antibodies, but positive test results are less likely in persons with mild or purely ocular forms.  If the test is done in a reputable laboratory, the chance of receiving a false positive test is small.  D753-54.
[4] A "fasciculation" is a "muscular twitching involving contiguous groups of muscle fibers."  Webster's Third New International Dictionary 825 (2002).

unusual symptom for MG, one she was "not aware of in association with [MG]." *Id*.  Dr. Lash determined medication was not necessary, but stated that if symptoms became more bothersome as the day wore on, Mestinon[5] may be considered.  *Id*.  After this visit, Ms. Ayer began taking Mestinon.  D608.

At her August 24, 1998 office visit with Dr. Lash, Ms. Ayer reported that, after taking Mestinon, she had blurred vision for thirty minutes, but she was able to continue working; she also experienced increasing headaches similar to the tension headaches she had experienced in the past.  *Id*.  Dr. Lash observed "there are apparent twitches of the orbicular oculi muscle," but "no evidence of fatigue, no ptosis and extraocular motions are full without nystagmus."  *Id*.  Dr. Lash determined that Ms. Ayer's symptoms had failed to respond to Mestinon and recommended she gradually taper off the medication.  *Id*.

In the fall of 1998, Ms. Ayer was seen at the Myasthenia Gravis Center at Brigham and Women's Hospital for further testing.  D585.  The results of the Brigham and Women's Electromyography and Nerve Conduction studies, including repetitive nerve stimulation testing,[6] suggested a "post-synaptic neuromuscular junction disorder."  D587.  There was no evidence of a sensorimotor polyneuropathy, and all muscles examined in the left upper and lower extremities were normal.  *Id*.

In January 1999, Ms. Ayer reported to Dr. Lash that she was "doing quite a bit better," experiencing only occasional twitching.  D607.  Dr. Lash observed no evidence of fatigable ptosis, noted that her extraocular motions were full without nystagmus, and found her proximal upper extremity strength was five out of five bilaterally.  *Id*.  Dr. Lash concluded Ms. Ayer had

---

[5]  Mestinon is an anticholinesterases used to treat MG by boosting the body's neuromuscular transmitter acetylcholine by blocking the enzyme which usually breaks it down.  D755.  Mestinon does not cure MG, but can provide temporary improvement in muscle function.  *Id*.

[6]  Repetitive nerve stimulation tests are a way of testing MG by stimulating the nerve to a muscle and electrically recording any weakening muscle response.  D753.

"subtle myasthenia delineated with mildly elevated acetylcholine receptor antibodies and a positive repetitive stim EMG" and that medication intervention was unnecessary. *Id*.

In October 2000, Ms. Ayer presented to Dr. Lash with complaints of increasing difficulty performing activities such as gardening, peeling vegetables, or counting money for more than twenty minutes. D606. On examination, Dr. Lash reported that she had no fatigable ptosis, her extraocular motions were full without nystagmus, her proximal upper extremity strength was "4+ to 5 out of 5 bilaterally," and she was able to perform a deep knee bend, although it was mildly impaired by knee discomfort. *Id.* Dr. Lash noted that Ms. Ayer's "complaint of symptoms suggest that her myasthenia which had been quite mild, may becoming more active," and that to "better sort this out," she ordered her to undergo another acetylcholine receptor antibody test as well as pulmonary function tests. *Id*.

On November 3, 2000, Ms. Ayer reported no new symptoms and had no complaints with shortness of breath, change in speech, or double vision. D605. Although she noted that at the end of the day she still has difficulty counting money, she admitted that generally she was able to do all her regular work and home tasks. *Id*. Dr. Lash noted that, although the acetylcholine receptor binding antibody test revealed elevated levels of the antibody, it was less elevated than it had been. *Id*.; D477. Dr. Lash also remarked that Ms. Ayer had done reasonably well on the pulmonary functioning testing. D605. Dr. Lash's assessment remained the same—mild MG— and she did not recommend medication. *Id*.

On September 10, 2001, Ms. Ayer complained of diffuse increased weakness, mild increasing shortness of breath, and aches in her forearms and thighs. D604. She had no new vision problems and only occasionally had difficulty swallowing, but this had not changed. *Id*. Upon examination, Dr. Lash observed that Ms. Ayer's speech was fluent, her extraocular

motions were full without nystagmus, there was no fatigable ptosis, her proximal upper extremity strength and distal strength in the hands were five out of five, she was able to perform a deep knee bend and five toe raises on either side, she had mild difficulty hopping on either leg, and light touch sensation was intact throughout all limbs. *Id*. Dr. Lash noted her forearm and thigh symptoms were atypical of MG, and she set up further evaluation and testing.[7] *Id*. On September 13, 2001, Ms. Ayer's MG Panel D study reported high levels of acetylcholine receptor blocking, binding, and modulating antibodies. D460.

Ms. Ayer next saw Dr. Lash on October 8, 2002. She reported increasing difficulty swallowing and mild increasing shortness of breath as well as food sticking in her throat. D601. Ms. Ayer stated she was experiencing increased stress at work and wondered how this was playing into her symptoms. *Id*. Dr. Lash observed that Ms. Ayer's speech was fluent and of normal volume, her extraocular motions were full, her gait was stable, and there was no evidence of ptosis. *Id*. Because Dr. Lash concluded it was "not clear whether she is truly having an exacerbation of her symptoms," she ordered a spirometry and modified barium swallow before recommending that she take medication. *Id*. Ms. Ayer's barium swallow revealed "[e]ssentially normal swallowing mechanics with minimal delay in solid food material passage" and was "[o]therwise unremarkable." D602. Dr. Lash re-prescribed Mestinon. *Id*.

### E. December 2, 2002: Liberty Approves Short-Term Disability Benefits

As an employee of Fleet, Ms. Ayer was covered by its self-funded short-term disability plan administered by Liberty. *Compl*. at ¶ 7; *Def.'s Answer to Compl*. (Docket # 4) at ¶ 7. In Ms. Ayer's claim for short-term disability benefits, she reported she suffered from MG, which prevented her from communicating with customers or using the phone. D55; D57. On

---

[7] Dr. Lash found it notable that Ms. Ayer's sister has limb girdle muscular dystrophy and asked Ms. Ayer to get any records or further information regarding her sister's medical problems. D604.

November 18, 2002, Liberty received information from Dr. Lash confirming that Ms. Ayer was having difficulty swallowing and speaking and was experiencing shortness of breath and that she should stay out of work until December 4, 2002.  D54; D298.  On December 2, 2002, Liberty approved Ms. Ayer's short-term disability benefits through December 4, 2002.  D53.

At the December 4, 2002 appointment with Dr. Lash, Ms. Ayer reported she felt "somewhat better since having some time off from work."  D599.  Dr. Lash observed that Ms. Ayer's speech was entirely fluent with no dysarthria and her extraocular motions were full.  *Id.* Dr. Lash noted that, although she had placed no specific limitations on her activities, "this is a disease . . . which is difficult to predict in terms of how she will do with work demands over the next months to years," and therefore, "she will have to probably make a decision about whether she feels comfortable enough with her ability to communicate verbally in person or on the phone."[8]  *Id.*  Dr. Lash increased the dosage of Mestinon.  *Id*.

On December 6, 2002, Fleet reported that Ms. Ayer did not return to work on December 5, and that she would be out of work for an additional two to three weeks to try different medication dosages.  D53.  On December 23, 2002, Liberty approved Ms. Ayer's short-term disability benefits through January 17, 2003, commenting that her job as an operations manager required speech and verbal interaction with customers and staff.  D52.  On December 31, 2002, a Liberty nurse reviewed Ms. Ayer's medical records and noted that the affected muscle groups are the muscles that allow swallowing and speech, and therefore, because Ms. Ayer is required to speak with the public, she agreed Ms. Ayer was unable to perform her job duties.   D51. However, the nurse indicated that, if Fleet could accommodate her in a job that did not require speaking with the public, she could return to work.  *Id*.  Liberty also stated it was necessary to

---

[8] The Certification of Health Care Provider states that Ms. Ayer "was advised to stay out indefinitely" because her "job entails talking with public—this diagnosis causes her to be unable to carry out conversations."  D158.

secure updated information before April 4, 2003, when Ms. Ayer was next scheduled to see the doctor. *Id*.

### F.  January 8, 2003 – April 11, 2003:  Ongoing Symptoms and Return to Work Proposal

Ms. Ayer reported to Dr. Lash on January 8, 2003 that two or three times per week she had difficulty swallowing and intermittently had problems with her speech "to the point that she is still concerned about going back to work but would like to go back on a part-time basis." D164. Ms. Ayer was taking Mestinon five times daily. *Id*. Dr. Lash observed that Ms. Ayer had no ptosis, her extraocular motions were full, her speech was normal, and her upper proximal extremity strength was five out of five. *Id*. Dr. Lash recommended starting her on azathioprine (Imuran).[9] She also recommended she return to work part-time until a reevaluation in eight weeks. *Id*. Liberty extended Ms. Ayer's short-term disability benefits through January 31, 2003. D277.

On January 27, 2003, Liberty received a Physical Capacities Form from Dr. Lash indicating Ms. Ayer could return to work with restrictions:  she could sit for eight hours; she could stand, walk, bend, and drive for three hours with breaks; and she could push, pull, reach, handle, grasp, and finger for one hour with breaks. D167.  She could not kneel or squat. *Id*. Dr. Lash also noted Ms. Ayer had speaking limitations and sometimes ate slowly and had difficulty swallowing. *Id*. Liberty continued to review information from Dr. Lash regarding Ms. Ayer's work restrictions and discussed the matter with her Fleet supervisor to determine her return to work. D47-48. Liberty extended Ms. Ayer's short-term disability benefits through February 28, 2003. D47.

---

[9] Imuran is an immunosuppressive medication. D757.

On February 13, 2003, Fleet informed Liberty that (1) Fleet would be able to accept Ms. Ayer back to work on a part-time basis beginning February 18, 2003; (2) Fleet would divide her time between teller and supervisor duties and limit the time she would have to speak to customers; and, (3) Fleet would reevaluate her after thirty days to determine her ability to work full-time. *Id.* The next day, Fleet provided Ms. Ayer with an extensive memorandum outlining the accommodations to facilitate her return to work. D175-77. Fleet agreed to allow her to work a twenty-hour week for thirty days, consisting of four-hour days five days a week. D175. Ms. Ayer was to work as a teller on Monday, Tuesday, Thursday, and Friday and "on the desk" on Wednesday to allow her time to complete her paperwork and reporting responsibilities. *Id.* This work schedule was in line with the normal "time allocations" for the branch operations supervisor position, which consisted of working 80% as a teller and 20% as a supervisor and administrator. *Id.* The memo further stated:

> Due to the nature of your disability, specifically the unpredictable impairment, we will want (with your permission) to advise the Union Street Branch staff of any impairments that may unexpectedly occur in their presence. We will also want to enlist the assistance of one of your co-workers to be designated as your "buddy" . . . to be available to you to be the recipient of a distress signal (to be determined) should a situation occur while you are servicing a customer, talking on the telephone, or conversing with a co-worker, preventing you from continuing the conversation/activity. We want to take every precaution to ensure that no one, including you, is placed in an awkward situation. . . .

D175-76.

On February 17, 2003, Ms. Ayer informed Liberty that, after meeting with her employer, she realized she "would go right back into [a] stressful situation" and did not think she would be able to return to work at that time. D47. Ms. Ayer intimated she thought she would be placed at her desk, and not in the teller line where she would be "right in the line of fire." *Id.* She said she

felt that Fleet did not want her back, that they "were dragging their feet," and that the schedule was setting her up for failure. *Id.* The Liberty representative remarked that Ms. Ayer "progressively had more trouble speaking—sounds like tongue is swollen, trouble enunciating— got worse even after 5 minutes of conversation." *Id.* Ms. Ayer informed Fleet she would not return to work, and Liberty extended her short-term disability benefits through March 28, 2003. *Id*.

On March 18, 2003, Ms. Ayer complained to Dr. Lash of continued difficulty swallowing and chewing a couple times per week, difficulty lifting heavy objects, exacerbation of her symptoms by stress, the occasional feeling that her knee was about to buckle, and occasional slightly out-of-focus vision. D249. Ms. Ayer informed Dr. Lash that Fleet was no longer holding her job for her and she was considering going on long-term disability. *Id*. Dr. Lash noted Ms. Ayer's speech was fluent without any dysarthria, her extraocular motions were full, and there was no ptosis. *Id*. Dr. Lash stated her "situation is complex in that her examinations have really always been quite good here in the office but despite this, she reports substantial disability related to typical symptoms of [MG]." *Id*. Dr. Lash increased her Imuran dosage. *Id*. On March 20, 2003, Dr. Lash filled out a Physical Capacities Form for Liberty with the same limitations as on the previous form. D171. Liberty extended Ms. Ayer's short-term disability benefits through April 11, 2003. D243.

### G.  April 3, 2003:  Liberty Terminates Short-Term Disability Benefits

On April 2, 2003, Liberty reviewed whether Ms. Ayer's medical records supported her claimed workplace restrictions, including an evaluation by a registered nurse in Liberty's Managed Disability Services (MDS) Unit.[10] D44-45. The nurse remarked that the treatment was appropriate, but noted that, although medical information supports the diagnosis of MG, it does

---

[10] Liberty's Managed Disability Services Unit (MDS) provides consultation services for its case managers. D44-45.

not support the "restrictions and limitations of limited speaking ability." D44. The nurse further stated that additional information would be needed as "office exams continuously state normal speech with no dysarthria, and barium swallow testing was reported . . . to be normal—this means that no swallowing problems were found during this testing." *Id*.

On April 3, 2003, Liberty wrote to Ms. Ayer terminating her short-term disability benefits effective April 12, 2003. D244-46. The letter explained:

> While the diagnosis of [MG] is supported, the medical
> [information] does not support your inability to work on a full-time
> basis. Dr. Lash placed no specific restrictions on you preventing
> you from working full-time. Her notes report essentially normal
> physical exams, but state you do not feel comfortable working full-
> time. She places restrictions on your ability to push, pull, reach,
> handle, grasp, finger and lift, but states you have normal strength
> in your upper extremities. She references an abnormal EMG but
> has not provided the test results to support these restrictions. She
> states you have some speech limitations but does not clarify what
> these limitations are, and no speech pathology, therapy, or
> evaluation reports have been provided, and the office notes make
> no reference to them being performed. Dr. Lash states you are
> considering going onto long term disability, but does not place you
> on disability. The medical documentation provided does not
> support your continued disability.

D245.[11]

## H. May 8, 2003-August 1, 2003:  Medical Condition

After the termination of short-term disability benefits, Ms. Ayer had several doctor's visits. On May 8, 2003, Ms. Ayer reported to Dr. Lash that she was doing better overall, had completely stopped taking Imuran, and had cut her Mestinon down to three times a day. D594. Ms. Ayer conveyed that she still had slurred speech several times per week, but less severe than it had been, and that her swallowing problems have been substantially better. *Id*. She did not

---

[11] On that same date, Liberty noted internally that it was denying any long-term disability claim because the elimination period had not been met. D7. The first date Ms. Ayer could collect long-term disability benefits would have been April 27, 2003. D56.

report any new weakness, numbness, double vision, or focal sensory symptoms. *Id*. Ms. Ayer intimated to Dr. Lash that she did not "quite feel that she is able to return to work, but is realizing that she would like to be able to go back to work very much and is hopeful that if she continues to improve she may be able to do so." *Id*. Dr. Lash noted that Ms. Ayer's speech was fluent, although at times it was "subtly dysarthric," her extraocular motions were full, and there was no evidence of ptosis. *Id*. Dr. Lash provided the following assessment:

> The patient has [MG] which has been relatively speaking on the mild side. She has not had any substantial pulmonary symptomatology and has generally been able to continue with all of her ADL's [activities of daily living]. Her principal problems are generalized fatigue, variable difficulties with speech and variable difficulties swallowing. I have some concerns with her cutting back her medication, particularly her Imuran as her symptomatology may rebound. However, she seems quite committed to cutting back her medication and is aware that if symptoms worsen she will need to restart medication. Issues around returning to work were discussed at some length. It was stressed to the patient that she has a disease which is very difficult to predict in terms of the waxing and waning of symptomatology. Working will not directly injure her, so as a physician I am not in a position to place specific restrictions on her activities. How much she does will need to be something that she monitors and limits as necessary. I will plan on seeing the patient back in Neurology Clinic in two months' time. I have asked her to call in the meantime should her symptoms worsen. At this point we will hold off further neurodiagnostic testing.

*Id*.

Ms. Ayer saw Dr. Lash again on August 1, 2003 and reported doing "quite a bit better." D593. Dr. Lash's notes reflect her eye twitching was almost completely resolved, swallowing was good except for very dry foods, speech was substantially improved, she was completely off Mestinon, she denied any shortness of breath, and she had been sleeping well. *Id.* Dr. Lash observed that her speech was fluent without any dysarthria, there was no ptosis, her extraocular motions were full, and her upper extremity strength was good. *Id.* Dr. Lash concluded that her

MG "seems to be doing better at this point with patient off medication."  *Id.*  On August 1, 2003,

Dr. Lash wrote a note stating:  "Patient is cleared to return to work avoiding sustained speaking

with the public as this may cause strain to the voice."  D179.

**I.       August 11, 2003 – October 6, 2003:  Appeal to Liberty and Liberty's Denial**

Ms. Ayer appealed the termination of short-term disability benefits to Liberty on August

11, 2003.  D236-39.  Attached to her appeal was a letter from Cheri Smith, a Fleet employee

relations representative, stating that Ms. Ayer's position as branch operations supervisor required

her "to be prepared to communicate at all times with employees and customers."  D240.  Ms.

Ayer also enclosed the May 8, 2003 office visit note from Dr. Lash.  D239.  In her appeal, Ms.

Ayer explained that her job sometimes required her to lift heavy bags of coins and to stand

almost the entire day.  D236.  She further explained that, because she was home alone every day

and did not talk to anyone, she was able to speak without incident for a short period of time when

she had an appointment with Dr. Lash or during an occasional telephone call.  D237.

Ms. Ayer's appeal file was sent to Elite Physicians Limited for an independent peer

review on September 16, 2003.  D42.  Dr. Joseph Jares, a board certified neurologist, reviewed

her file and prepared a report dated October 3, 2003.  D230-32.  Dr. Jares concluded:

> Based on the medical records, from a neurology perspective, Ms.
> Ayer has mild impairment due to objective findings. . . .  Ms. Ayer
> retains the ability to work on a full-time basis in a sedentary
> occupation.  However, absences would be expected during times of
> her exacerbations.  In terms of her speaking, she would need to
> limit this as much as possible. . . .  At this time, the restrictions and
> limitations suggested above would be temporary in nature
> depending upon the course of Ms. Ayer's myasthenia.  Perhaps she
> may be in a period of relative remission, as she has been able to
> successfully cut back her Mestinon and has stopped her Imuran. . .
> .  Ms. Ayer's attending physician's restrictions and limitations are
> reasonable based upon her symptoms. . . .  Ms. Ayer's self-
> reported limitations are excessive given the fact that she is able to
> travel to Florida and do activities of daily living as mentioned

>including grocery shopping.  These would not indicate a condition
>of such severity that she would not be capable of working in any
>fashion.  In terms of Ms. Ayer's speech, I would be interested
>knowing if speech therapy assessment has been performed to
>assess her perceived variable abilities to communicate.

D231-32.  On October 6, 2003, Liberty upheld the denial of continued short-term disability benefits based on Dr. Lash's March 18, May 8, and August 1, 2003 office visits notes, Ayer's March 2003 Physical Capacities Form, and Dr. Jares's independent review.  D145-47.

### J.   October 31, 2003 – December 30, 2003:   Appeal to Fleet and Fleet Grants Benefits

On October 31, 2003, Ms. Ayer wrote Fleet informing it of her intention to appeal Liberty's termination of her short-term disability benefits and requesting it contact her to discuss what was needed to review her entire claim.  D144.  About one week later, Audrey Clifton, a senior plan expert at Fleet, wrote to Ms. Ayer explaining that in "considering a claim for approval of a disability benefit, objective medical documentation indicating what prevents an employee from performing the duties of his or her job must be received.  Specific detail providing restrictions and limitations preventing you from returning to work is necessary in order to consider benefits."  D143.

On December 4, 2003, Ms. Ayer wrote to Ms. Clifton at Fleet and stated that (1) whenever she is stressed, anxious, or nervous she begins to have trouble with slurred speech;  (2) she was surprised that her manager at Fleet decided to fill her position and had very little communication with her when she was out on disability; (3) although her doctor thought it was a good idea for her to return to work on a part-time basis, Fleet did not get back to her for over a month and was not willing to provide her with what she felt were the reasonable

accommodations she had requested;[12] and, (4) her managers at Fleet told her she should "think of being a stay at home grandma" or seek other endeavors because they were uncomfortable about her return.  D148-49.  On December 30, 2003, Fleet responded, stating:  "Our appeals review committee has reviewed the medical documentation you provided from your physician and has determined that short-term disability benefits are due for the period of April 12, 2003 through April 28, 2003."[13]  D307.

### K.  Claim for Long-Term Disability Benefits and Liberty's Denial

Ms. Ayer's short-term disability period expired on April 27, 2003 and, once Fleet paid the additional two weeks of short-term disability benefits, Ms. Ayer's claim became a long-term disability claim.  D56.  Reviewing Ms. Ayer's claim for long-term disability benefits, Liberty looked at the most recent medical records from Dr. Lash.  D5.  In the office note dated February 20, 2004, Dr. Lash reported that Ms. Ayer's MG "on clinical exam in the office continues to be quite mild, but the patient continues to be bothered by symptoms at home" such as difficulty with speech and swallowing, fatigue with chewing nuts and meat, and twitching of the face, throat, and especially the eyes.  D210.  Dr. Lash recommended Ms. Ayer stop taking Mestinon, but refused to prescribe any other medication because of toxicity.  *Id*.  Ms. Ayer said she wanted to return to work on a part-time basis, and Dr. Lash encouraged her to do so.  *Id*.

---

[12] On November 26, 2003, Dr. Lash filled out an Attending Physician's Statement indicating that it was "ok [for Ms. Ayer] to return to work if not substantial voice demand."  D180.  Dr. Lash indicated that Ms. Ayer's physical impairment was class 4—"[m]oderate limitation of functional capacity; capable of clerical/administrative activity," if "not requiring excessive speech esp[ecially] to public"; and her mental/nervous impairment was class 3— "[p]atient is able to engage in only limited stressful situations and engage only in limited interpersonal relations (moderate limitations)."  D181.

[13] The parties do not agree whether Fleet's decision was within the terms of the short-term disability plan.  Liberty points to a Fleet email dated December 30, 2003, which indicates that Fleet made the decision "mainly because there was no job in her location near Bangor, ME that could accommodate the restriction of 'no verbal communication with customers.'  They only have teller and customer service jobs available."  D140.  Ms. Ayer points to the Fleet letter dated December 30, 2003 awarding benefits.  D307.  It does not matter.  The current claim is for long-term disability benefits.

On March 12, 2004, following a review of Ms. Ayer's medical records by a registered nurse in Liberty's MDS Unit, Liberty determined that (1) her work restrictions and limitations had not changed since Dr. Jares's peer review in October 2003; (2) with regard to the list of diagnoses, her reported "impairments are not discussed by any medical providers, and impairments would be minimal as evidenced by [her] ability to continue to work throughout this period"; (3) reports of conditions related to stress while working were not substantiated; (4) Dr. Lash's assessment that her mental/nervous impairment was class 3 "is not supported by any objective medical information"; and, (5) she "obviously demonstrates the capacity for organizing and communicating detailed information in a clear and concise non-verbal manner."  D5.

On March 16, 2004, Liberty's case manager recommended denying Ms. Ayer's long-term disability claim because there was no additional medical information indicating her restrictions and limitations had changed since Dr. Jares's October 2003 review or that she was totally disabled in her own occupation.  D4-5.  Liberty sent Ms. Ayer a letter dated March 22, 2004, denying her claim for long-term disability benefits:  "Since there is no additional medical information that would medically support restrictions or limitations that would preclude you from performing the duties of your own occupation, you do not meet the definition of disability as defined by the FleetBoston LTD policy, and we must deny your claim for benefits."  D134-37.

**L.  September 13, 2004 – October 20, 2004:  Ms. Ayer Appeals Liberty's Denial of Long-Term Disability Benefits to Liberty and Liberty Denies the Appeal**

On September 13, 2004, Ms. Ayer, though counsel, wrote Liberty to appeal the denial of long-term disability benefits.  D130-32.  On October 12, 2004, Liberty received from Ms. Ayer's attorney Dr. Lash's medical notes dated August 25, 2004 and September 29, 2004.  D65.

The August 25, 2004 note stated that Ms. Ayer was continuing to have problems with her speech and had been under increased stress over the summer with a large family reunion and her

daughter's wedding.  D66.  Dr. Lash observed that her speech was "fluent without any slurred quality," her extraocular motions were full, there was no ptosis, and her upper extremity strength was good.  *Id.*  Ms. Ayer brought in "a tape of what her speech does when it becomes a problem."  *Id*.  Dr. Lash listened to the tape and noted that "she does have some lisping of her words and slurring of her speech, but it does have good volume somewhat unusual for [MG]."  *Id*.  Dr. Lash noted that Ms. Ayer seemed "to be really doing quite well, although she has variable speech problems that are in some ways atypical for [MG]."  She recommended Ms. Ayer continue taking Mestinon.  *Id*.

The September 29, 2004 note reflects that Ms. Ayer continued to have increasing difficulty swallowing and speaking, even first thing in the morning.  D67.  Objectively, Dr. Lash reported that Ms. Ayer spoke "with a very thick tongue, but her volume is good and there is no evidence of fatiguing," her extraocular motions were full, and there was no ptosis.  *Id.*  She noted that her overall presentation "continues to be rather atypical" and recommended that she be evaluated by Dr. Dawson at Brigham and Women's Hospital.  *Id*.

Liberty referred Ms. Ayer's file to a second Board Certified Neurologist, Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N., for another peer review.  D2.  Dr. Huntoon performed a comprehensive analysis of Ms. Ayer's medical records and insurance-related documents, including:  (1) her medical records from December 30, 1996 through September 2, 2004; (2) Dr. Jares's October 2003 independent medical review; (3) radiology records, diagnostic test records, and laboratory records; (4) Liberty's activities questionnaires completed by Ms. Ayer; (5) reports of pain or other symptoms completed by Ms. Ayer; (6) adult function form completed by Ms. Ayer; (7) Dr. Lash's work restrictions form; (8) Dr. Lash's physical capacities forms; (9) Dr. Lash's attending physician statement; and, (10) audiotape submitted by Ms. Ayer.  D111-18.

On October 6, 2004, Dr. Huntoon provided the following answers to the questions presented by Liberty:

1.  *Provide a description of the claimant's impairments, if any, and outline how any impairment translates to restrictions and limitations on physical activities.*

> Claimant's primary diagnosis is [MG].  Evidence from the records I reviewed indicates that symptoms due to [MG] date back to 1997.  Initial symptoms were ptosis (drooping) of the right eyelid and difficulty talking.  The diagnosis of [MG] was first made in April of 1998. . . .

> Although [MG] can cause speech impairment, the records I reviewed indicate that there is a strong psychological component contributing to claimant's intermittent speech problems. . . .  This psychological component related to stress has made it difficult to distinguish between symptoms due to physical disorder and symptoms associated with claimant's complaint of stress . . . .

> All of the alleged restrictions and limitations in this case, are based on claimant's own reports. . . .

> The treating neurologist's records describe claimant's [MG] as "mild," or "very mild," and despite some variable speech problems, the treating neurologist noted that claimant was doing quite well on 8/25/2004 . . . .  The neurologist's records indicate no specific limitations, and indicate that claimant is capable of performing all activities of daily living . . . .  The neurologist's assessment is consistent with claimant's self-reported abilities . . . .

> Documentation on insurance-related forms, ranges from no restrictions or limitations, to some limitations based on claimant's self-reported difficulties, to limitations which appear to be compatible with the ability to work as a branch manager for a bank. . . .

2.  *Are the claimant's self-reported limitations clinically supported/substantiated based on your review of the medical information?*

> In general, there appears to be a disparity between the limitations and restrictions reported by the claimant, and objective medical findings on examination as documented in the records I reviewed.  This disparity was noted by the treating neurologist and by an independent reviewer, and suggests symptom magnification by claimant . . . .

3.   *Please listen to the audiotape provided on appeal. Would you place restrictions on her speaking with the public, which is an essential part of her occupation as a branch manager?*

The volume of the speaker's voice was quite good and well-maintained throughout the recording. The clinical hallmark of [MG] is increased fatigability of muscles. Patients with speech involvement in [MG] may exhibit a decreased volume of speech with prolonged talking. This is usually tested clinically by having the patient count out loud past 30. A three minute period of talking, therefore, would be sufficient to demonstrate this finding. Although failure to demonstrate decreased volume of the voice with prolonged talking would not exclude [MG] as a cause of "speech problems," it would, likewise, not support the theory that the "speech problem" is due entirely to [MG] or that it is a symptom founded on an objective medical basis.

The rate and prosody of the voice on the tape were normal. The articulation of the speech on the tape was extremely poor and unintelligible much of the time. Myasthenic speech frequently has a nasal quality to it, which the voice on the tape did not exhibit.

The difficulty with evaluating an audiotape as a means of assessing possible restrictions and limitations relative to speech, is as follows:

The type of speech on the audiotape can be produced by a speaker voluntarily restricting movements of the tongue and mouth. The audiotape also does not allow for clinical testing by a neurologist at the time the symptom is present, to determine whether or not there is any muscle weakness consistent with the speech disturbance.

Since there is no finding of speech disturbance on neurologic examination in the records I reviewed, the audiotape, by itself, should not be accepted as "evidence" of impaired speech.

A neurologist could investigate the validity and nature of claimant's speech problem by performing a Tensilon test with saline control at a time when the symptom is present. This might be done at the end of the day when the claimant has been talking a lot during the day, or steps could be taken so as to bring out the speech problem via a period of prolonged talking during the office

visit.  The latter would also give the neurologist the opportunity to actually see the symptom develop.  If claimant's speech problem improves following administration of Tensilon, but not following administration of saline, then an objective basis for the problem could be documented and possible disability could be reconsidered.  An improvement following administration of the saline control would indicate a non-organic basis (psychological or malingering) for the speech problem.  In practice, not all myasthenics show improvement with Tensilon.

D118-25.  Dr. Huntoon later reexamined the audiotape and concluded:

Following the first recorded segment, there was a prolonged period of silence (approximately 35 seconds) on the tape.  I listened to a second recorded segment on the tape which was about 2 minutes 20 seconds long.  This second segment seemed to be one side of a phone conversation.  The speaker maintained good volume and normal rate and prosody throughout the second segment.  The articulation was impaired, but much better than the articulation on the 1st segment of the tape.  The third recorded segment was approximately four minutes and 20 seconds long.  There was an announcement at the beginning of the third segment, which indicated that it was a recorded call.  In addition to the primary speaker, there was a second female speaker.  The second speaker referred to the primary speaker as "Linda." . . . .  The primary speaker . . . maintained good volume, normal rate and prosody throughout the recording.  The articulation was slightly impaired, but much better as compared to the first recorded segment. . . .

The Conclusions remain the same as stated in #3 above.  Specifically, since there is no finding of speech disturbance on neurologic examination in the records I reviewed, the audiotape, by itself, should not be accepted as "evidence" of impaired speech.

D85.

On October 20, 2004, Liberty wrote to Ms. Ayer's attorney, denying her appeal of its denial of her long-term disability claim.  D90-93.  Ms. Ayer's attorney then wrote to Liberty requesting Dr. Huntoon's resume and documentation of his level of expertise treating MG patients, "especially those experiencing problems with speech and swallowing."  D59.  Ms. Ayer's attorney informed Liberty that she had just been released from Brigham and Women's

20

Hospital after a nine-day hospitalization for intravenous immunoglobulin treatment for an acute exacerbation of her MG and offered to obtain the Brigham and Women's record if Liberty would reopen the appeal. *Id*.   Ms. Ayer's attorney enclosed an October 25, 2004 office note from her new neurologist, Agha Raza, M.D, stating that she was undergoing an exacerbation of MG. D59; 61-64.  On November 17, 2004, Liberty sent Ms. Ayer her long-term disability claim file, but explained that the resumes of those who evaluated her were not available to Liberty.  D58. Receiving no response to her request for reconsideration of the appeal, Ms. Ayer filed this Complaint. *Id.*

## II.  LEGAL STANDARD

Courts review benefits decisions by plan administrators de novo, unless the benefits plan grants the administrator discretion to make benefits decisions.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Terry v. Bayer Corp*., 145 F.3d 28, 37 (1st Cir. 1998). Where, as here,[14] a plan administrator has the discretion to determine eligibility for and entitlement to benefits, the district court must uphold the administrator's decision "unless it is arbitrary, capricious, or an abuse of discretion."  *Glista v. UNUM Life Ins. Co. of Am*., 378 F.3d 113, 125 (1st Cir. 2004) (quoting *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 212-13 (1st Cir. 2004)).  Liberty's decision will be upheld under this standard "if the denial is reasonable and supported by substantial evidence."  *Id.* at 126; *see also Leahy v. Raytheon Co*., 315 F.3d 11, 17 (1st Cir. 2002) ("The arbitrary and capricious standard asks only whether a factfinder's decision is plausible in light of the record as a whole . . . .").  "Substantial evidence" means evidence reasonably sufficient to support a conclusion.  *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181,

---

[14] The General Provisions of the contract for insurance provides:  "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder."  D35.  Ms. Ayer concedes Liberty's discretionary authority.  *Pl.'s Resp. to Def.'s Mot. for J. on Stipulated R.* (Docket # 15) (*Pl.'s Resp.*) at 17.

184 (1st Cir. 1998).  Sufficient evidence "does not disappear merely by reason of contradictory evidence."  *Id*.; *see also Gannon,* 360 F.3d at 213 ("[T]he existence of contrary evidence does not, in itself, make the administrator's decision arbitrary.").  It is the responsibility of the plan administrator to weigh conflicting evidence.  *Vlass v. Raytheon Employees Disability Trust,* 244 F.3d 27, 32 (1st Cir. 2001).  The issue is "not which side [the Court] believe[s] is right, but whether [the insurer] had substantial evidentiary grounds for a reasonable decision in its favor."  *Brigham v. Sun Life of Can.,* 317 F.3d 72, 85 (1st Cir. 2003) (quoting *Doyle,* 144 F.3d at 184) (internal punctuation omitted).

## III.  DISCUSSION

The policy defines "disability" or "disabled," in pertinent part, as follows:

> 1.  For persons other than pilots, co-pilots, and crew of an aircraft:
>
> > i.  If the Covered Person is eligible for the 24 Month Own Occupation Benefit, **"Disability"** or **"Disabled"** means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and
> >
> > ii.  After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes fitted by training, education, experience, age and physical and mental capacity.

D13-14.  For Ms. Ayer to prevail, she must demonstrate the administrative record, as it existed at the time of Liberty's decision to deny benefits, contains evidence that demonstrates her inability to perform the essential duties of her "own occupation."[15]

---

[15] Ms. Ayer also argues that Liberty improperly terminated her short-term disability benefits.  However, Fleet's decision to pay Ms. Ayer additional short-term disability benefits does not affect the analysis of whether Liberty improperly denied her claim for long-term disability benefits.

### A. "Own Occupation"

Ms. Ayer asserts that in using a Department of Labor definition of bank manager from the Dictionary of Occupational Titles (DOT),[16] Liberty used the wrong job description to determine that she had not shown she was disabled from her "own occupation."  Ms. Ayer posits that the DOT description does not match Fleet's description of the duties and physical requirements of her actual job.  Specifically, she argues there is a discrepancy about whether her occupation requires sedentary or light physical capacity.

The DOT describes the position of "Manager, Branch Bank" as a sedentary position, with occasional lifting, carrying, pushing, and pulling, and constant talking.  D263.  On the other hand, Fleet indicated on a Physical Job Evaluation Form that Ms. Ayer's job required sitting for four hours and standing for four hours.  D282.  Based on the medical records and reports, Liberty determined that Ms. Ayer was not prevented from performing her own occupation and therefore did not meet the definition of disability as defined by the policy.  D136.

The Liberty policy does not define the term "own occupation."  When the term "occupation" is undefined, courts properly defer to the DOT definition of the term, because insurers issuing disability policies "cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation."  *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 120 F. Supp. 2d 1253, 1259 (D. Nev. 2000); *see also Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 272-73 (4th Cir. 2002) (upholding reliance on DOT as "objectively reasonable" in ERISA action and noting that "[a] general job description of the DOT, to be applicable, must involve

---

[16] The DOT is the result of over fifty years of occupational data collection and evaluation for the very purpose of defining specific "occupations."  *Dionida v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 2d 934, 939-40 n.4 (N.D. Cal. 1999).  The DOT groups various jobs into "occupations" based on their similarities, and therefore an "occupation" in the DOT covers more than one particular job.  *Id*.  The DOT is widely and routinely used to define "occupations" in the United States economy.  *Id*.

comparable duties but not necessarily every duty"); *Dionida v. Reliance Standard Life Ins. Co.,* 50 F. Supp. 2d 934, 939-40 n.4 (N.D. Cal. 1999) (noting that the DOT is "widely and routinely used to define 'occupations' in the U.S. economy" and that it is "reasonable for plan administrators, and courts, to use it" in making disability determinations under ERISA). Courts have applied the term, "own occupation," generally and have evaluated disability in light of the usual duties of that occupation, not on ad hoc peculiarities of a specific job or the requirements of a particular employer who may require activities beyond that generally contemplated by the "occupation." *Ehrensaft*, 120 F. Supp. 2d at 1259; *see also Panther v. Synthes (U.S.A.),* 371 F. Supp. 2d 1267, 1276-77 (D. Kan. 2005) (Sun Life properly defined "own occupation" to mean one's occupation as it is performed routinely in the labor market, rather than how a particular employee performed his or her job for a particular employer); *Ceasar v. Hartford Life & Accident Ins. Co.,* 947 F. Supp. 204, 207-08 (D.S.C. 1996) (concluding that the defendant did not abuse its discretion when it determined that the plaintiff could perform his "own occupation" as it existed in the national economy, as opposed to his particular job which required rotating shift requirements); *Hanser v. Ralston Purina Co.,* 821 F. Supp. 473, 478 (E.D. Mich. 1993) (concluding, under an arbitrary and capricious review, "that defendant's interpretation of the terms 'regular occupation' as meaning the type of work which a covered employee is trained to perform rather than the specific job at which the employee was working . . . is a rational interpretation supported by the plain meaning of the words.").

This Court concludes that Liberty did not err in deferring to the DOT definition of branch bank manager, rather than Fleet's description of Ms. Ayer's job, to determine whether Ms. Ayer had shown she was disabled from performing her "own occupation."

### B. Liberty's Actions under the Arbitrary and Capricious Standard[17]

Within its limited scope of review, this Court cannot dissect the medical opinions. The question is not whether this Court agrees with Liberty's interpretation of the voluminous medical reports, but whether there is "substantial evidence" to support its conclusion. To this end, this Court will review the evidence Liberty asserts supports its conclusion to determine whether it comports with the "substantial evidence" requirement.

Liberty points to a number of medical reports confirming Ms. Ayer was able to perform the essential duties of her occupation. Dr. Lash, her primary treating physician, opined that Ms. Ayer's MG was mild and she was not exhibiting any disabling symptoms. In January 2003, Dr. Lash placed physical restrictions on Ms. Ayer's ability to work, which included sitting for eight hours; standing, walking, bending, and driving for no more than three hours; pushing, pulling, reaching, handling, grasping, and fingering for no more than one hour; and no squatting or kneeling. These restrictions largely comport with both the DOT description and Fleet's description of Ms. Ayer's job position. Furthermore, Dr. Lash continually reported that Ms. Ayer's speech was fluent and of normal volume without any slurred quality. Although she acknowledged Ms. Ayer may be limited in speaking for substantial periods of time, this limitation does not by itself show that she was disabled from performing the substantial responsibilities of her job. On several occasions, Dr. Lash indicated that Ms. Ayer was able to return to work. Indeed, on May 8, 2004, Dr. Lash stated that working "will not directly injure" Ms. Ayer, and therefore, as a physician she was "not in a position to place specific restrictions"

---

[17] Ms. Ayer also argues that Liberty denied her claim for long-term disability benefits because she failed to satisfy the elimination period as defined by the policy. However, Liberty explained that Fleet's decision to pay her remaining short-term disability benefits resolved the issue of the elimination period, and Liberty did not cite the elimination period as grounds for denying her claim. Because Fleet, not Liberty, awarded Ms. Ayer the remaining short-term disability benefits, Fleet's determination was not the "benchmark" whereby Liberty should have considered Ms. Ayer disabled, absent a change in condition for the better.


on Ms. Ayer's activities.[18]  D172.  This Court cannot say that it was wrong for Liberty to rely on the medical opinion of Ms. Ayer's primary treating physician as a basis for denying her claim. *See Heller v. Fortis Benefits Ins. Co.,* 142 F.3d 487, 491 (D.C. Cir. 1998), *cert. denied*, 525 U.S. 930 (1998)  (affirming summary judgment for administrator when attending physician advised that claimant was "OK for sedentary work"); *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1452 (11th Cir. 1997) (affirming summary judgment for administrator where one of claimant's two treating physicians advised that claimant was "capable of sedentary work"); *Lane v. Dir. of Employee Benefits, Gannett Co.*, 253 F. Supp. 2d 57, 63 (D. Mass. 2003) (granting summary judgment for administrator where claimant's primary treating physician believed claimant was "able to perform sedentary work").

Dr. Lash was not the only physician who believed Ms. Ayer was capable of substantially performing her job duties.  Dr. Jares reviewed her medical records in connection with her short-term disability claim and concluded she had a "mild impairment due to objective findings" and that any restrictions and limitations on her working "would be temporary in nature."  D200.  Dr. Jares concluded Ms. Ayer was able to "work on a full-time basis in a sedentary occupation," but noted that she would have to limit speaking "as much as possible."  *Id*.  Contrary to Ms. Ayer's position, Dr. Jares's recommendation that she limit speaking "as much as possible" does not mean she is unable to perform her own occupation under the policy.

Finally, Dr. Huntoon, after completing a comprehensive review of Ms. Ayer's medical records and history, concluded she was not disabled under the policy.  Specifically, Dr. Huntoon reported there were no objective medical findings documented in the records he reviewed which

---

[18] In an attempt to undermine Dr. Lash's conclusion, Ms. Ayer argues that the "question of whether [she] is capable of working full time in her occupation which undeniably requires constant speaking, is not a medical question." *Pl.'s Resp.* at 19.  Ms. Ayer cites no legal authority to support this proposition.  To the contrary, case law is clear that disability determinations are based on medical opinions.

would support restrictions or limitations based on impairment of speech.  D82-83.  Dr. Huntoon found a "disparity between the limitations and restrictions reported by [Ms. Ayer], and objective medical findings on examination as documented in the records."  D82.  With respect to the audiotape provided by Ms. Ayer, Dr. Huntoon found no sign of increased fatigue in her speech, which is the "clinical hallmark of [MG]," and noted that her volume was "quite good and well-maintained," the rate and prosody of her voice were normal, and her speech had no nasal quality. D83.

This Court cannot say that it was wrong for Liberty to rely on the findings of independent reviewing physicians such as Dr. Jares and Dr. Huntoon.  *See Gannon*, 360 F.3d at 214 (physician's independent review of a claimant's file is reliable medical evidence to support denial of benefits even though he did not physically examine claimant); *Hightshue v. AIG Life Ins. Co.,* 135 F.3d 1144, 1148 (7th Cir. 1998) (administrator entitled to rely on physician's independent review of claimant's medical file); *Kocsis v. Standard Ins. Co.,* 142 F. Supp. 2d 241, 252 (D. Conn. 2001) (summary judgment appropriate based on two physicians' independent review of the plaintiff's entire claim file).

None of the medical experts concluded Ms. Ayer's condition would keep her from performing the substantial duties of her occupation.  There is a plethora of evidence indicating that, at all pertinent times, her MG was mild and not totally disabling under the terms of the policy.  That there may be contradictory evidence, such as medical office notes reporting Ms. Ayer's speech as "subtly disarthric" or "thick," does not automatically mean that Liberty's decision is arbitrary and capricious and unsupported by substantial evidence.[19]  Based on the evidence in this record and mindful of its limited role in reviewing Liberty's decision in this case, this Court concludes Liberty's denial of long-term disability benefits was supported by

---

[19] Dr. Simone noted that Ms. Ayer had somewhat thickened speech on two occasions.  D414-15.

27

substantial evidence and must be sustained.  *See Jestings v. New England Tel. & Tel. Co*., 757 F.2d 8, 9 (1st Cir.1985); *Johnson v. UNUM Life Ins. Co. of Am.,* 329 F. Supp. 2d 161, 169 (D. Me. 2004); *Guarino v. Metro. Life Ins. Co*., 915 F. Supp. 435, 445 (D. Mass. 1995).

If Ms. Ayer's disability claim were based on her mental health and the stress caused by her position with Fleet, she should have sought documentation from a mental health professional. No such evidence has been provided.  While perhaps it was not advisable for Ms. Ayer to return to her former job at Fleet due to the apparent stress of that work environment, it was not arbitrary for Liberty to conclude that she could perform the material duties of a branch operations supervisor.  *See Pelletier v. Reliance Standard Life Ins. Co.*, 223 F. Supp. 2d 298, 306 (D. Me. 2002).  This Court cannot say such a finding is patently unreasonable based on the evidence.

### C.  Bias of Independent Medical Examiner

Ms. Ayer contends that Dr. Huntoon was biased, citing his affidavit in the Terri Schiavo matter and an article he authored concerning governmental subsidies.  She urges this Court to disregard his medical review.  These attachments are not part of the stipulated record nor were they part of the administrative record Liberty considered.  Further, the amended scheduling order (Docket # 8) specifically established a deadline of March 1, 2005 to supplement the administrative record, and Ms. Ayer failed to do so.

This Court must address the final ERISA administrative decision.  *Orndorf v. Paul Revere Life Ins. Co.,* 404 F.3d 510, 519 (1st Cir. 2005).  "It would offend interests in finality and exhaustion of administrative procedures required by ERISA to shift the focus from that decision to a moving target by presenting extra-administrative record evidence going to the substance of the decision."  *Id.*  There is no claim Ms. Ayer was denied an opportunity to present evidence to the administrator.  Furthermore, the final administrative decision acts as a temporal cut off point.

28

*Id.*   The claimant may not come to court and ask it to consider post-denial evidence in an effort to reopen the administrative decision.[20]

## IV.  CONCLUSION[21]

This Court GRANTS the Defendant's Motion for Judgment on Stipulated Record.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 1st day of August, 2005

---

[20] This Court notes that Liberty did not rely exclusively on Dr. Huntoon's medical review in denying Ms. Ayer's claim for long-term disability benefits.

[21] In light of the disposition of this case, this Court need not address Ms. Ayer's request for future benefits and attorney fees.